UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                              )
BURK & REEDY, LLP and JAMES BURK,    )
                                                              )
                Plaintiffs,                              )
                                                              )
           v.                                               )    Civil Action No. 13-890 (RBW)
                                                              )
AMERICAN GUARANTEE AND LIABILITY )
INSURANCE COMPANY,                            )
                                                              )
                Defendant.                              )
_____)

**MEMORANDUM OPINION**

      The plaintiffs, Burk & Reedy, LLP and James Burk, filed this civil action in the Superior Court of the District of Columbia ("Superior Court") against the defendant, American Guarantee and Liability Insurance Company, seeking various forms of relief as a result of the defendant's denial of coverage and indemnification for third-party claims being asserted against them in a separate action in Superior Court. See, e.g., Notice of Removal at 1, 4. The defendant then removed the action to this Court. See id. Currently pending before the Court are the parties' motions for summary judgment. Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J. Mot."); Defendant American Guarantee and Liability Insurance Company's Motion for Summary Judgment ("Def.'s Summ. J. Mot."). After carefully considering the parties' submissions,[1] the Court concludes for the following reasons that it must grant the defendant's motion for summary judgment and deny the plaintiff's motion.

---

[1] In addition to the filings already mentioned, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J.

(continued . . .)

1

## I.  BACKGROUND

The following facts are undisputed.  China Trade and Investments, LLC ("CTI") was an importer and exporter of urea.  Def.'s Facts ¶ 4; see also Pls.' Resp. to Def.'s Facts ¶ 4.  Plaintiff James Burk "was a co-managing member of CTI," who had at least a 32.5% ownership interest in CTI at all relevant times in this dispute.  Def.'s Facts ¶¶ 5, 6; see also Pls.' Resp. to Def.'s Facts ¶ 4.  "On or about October 31, 2008," plaintiff James Burk and Steven Allemang, another co-managing member of CTI, executed an agreement with Gratian M. Yatsevitch, III, whereby Mr. Yatsevitch became a "32.5% owner of CTI in consideration for [Mr.] Yatsevitch's agreement to secure collateral for a loan to CTI."  Def.'s Facts ¶ 7; see also Pls.' Resp. to Def.'s Facts ¶ 4.  On December 8, 2008, Mr. Yatsevitch secured a $325,000 loan for CTI from lender Hard Money Bankers, and thus became a 32.5% owner of CTI.  Def.'s Facts ¶¶ 8-9; see also Pls.' Resp. to Def.'s Facts ¶ 4.  Mr. Yatsevitch "was made a guarantor of the loan to CTI . . . and real property owned by [Mr.] Yatsevitch was encumbered as collateral for the loan . . . ."  Def.'s Facts ¶ 10; see also Pls.' Resp. to Def.'s Facts ¶ 4.  "[T]he loan was to fund CTI's transactions involving the sale of urea."  Def.'s Facts ¶ 13; see also Pls.' Resp. to Def.'s Facts ¶ 6.

---

(. . . continued)
Mem."); (2) the Statement of Undisputed Facts in Support of [the] Plaintiffs' Motion for Summary Judgment ("Pls.' Facts"); (3) the Memorandum of Points and Authorities by American Guarantee and Liability Insurance Company in Opposition to [the] Plaintiffs' Motion for Summary Judgment ("Def.'s Opp'n to Pls.' Summ. J. Mot."); (4) the Plaintiffs' Reply to [the Defendant]'s Opposition to Plaintiffs James Burke and Burke & Reedy LLP's Motion for Summary Judgment ("Pls.' Reply"); (5) the American Guarantee and Liability Insurance Company's Response to [the] Plaintiffs' Statement of Genuine Issues ("Def.'s Resp. to Pls.' Facts"); (6) the Memorandum of Points and Authorities in Support of American Guarantee and Liability Insurance Company's Motion for Summary Judgment ("Def.'s Summ. J. Mem."); (7) the American Guarantee and Liability Insurance Company's Statement of Material Facts ("Def.'s Facts"); (8) the Opposition of Plaintiffs James Burk and Burk and Reedy LLP to [the Defendant]'s Motion for Summary Judgment ("Pls.' Opp'n to Def.'s Summ. J. Mot."); (9) the Reply Memorandum of Points and Authorities by American Guarantee and Liability Insurance Company to the Opposition of [the] Plaintiffs['] of its [sic] Motion for Summary Judgment ("Def.'s Reply"); and (10) James Burk and Burk and Reedy LLP Response to [the] Defendant's Statement of Material Facts ("Pls.' Resp. to Def.'s Facts").

Thereafter, "CTI did not consummate the urea deals and the loan was not repaid," Def.'s Facts ¶ 14; see also Pls.' Resp. to Def.'s Facts ¶ 6, and "the lender took actions to initiate a foreclosure sale of the real property that [Mr.] Yatsevitch used as collateral for the loan," Def.'s Facts ¶ 15; see also Pls.' Resp. to Def.'s Facts ¶ 6. The real property "was eventually sold and the loan was repaid." Def.'s Facts ¶ 16; see also Pls.' Resp. to Def.'s Facts ¶ 6.

Mr. Yatsevitch then commenced a lawsuit in Superior Court against the plaintiffs, seeking "money and real property that he lost in connection with various business ventures allegedly orchestrated by [plaintiff James] Burk" (the "underlying action"). Def.'s Facts ¶¶ 1-2; see also Pls.' Resp. to Def.'s Facts ¶¶ 1-2; Pls.' Summ. J. Mot., Exhibit ("Ex.") 4 (Yatsevitch Amended Complaint ("Yatsevitch Am. Compl.")). Mr. Yatsevitch initially filed fourteen claims against the plaintiffs, but the Superior Court has since dismissed ten of those claims, leaving only four at issue, including one for legal malpractice. Def.'s Facts ¶ 17; see also Pls.' Resp. to Def.'s Facts ¶ 4. Allegations in support of the legal malpractice claim include:

> CTI is the alter[]ego of . . . [plaintiff James] Burk and [Mr.] Allemang, who are both managing members of the [c]ompany[;]
>
> As a result, Mr. Yatsevitch told . . . [plaintiff James] Burk and [Mr.] Allemang that if he were to invest, he would have to be made one of CTI's managing members. [They] . . . agreed[;]
> . . .
> [Plaintiff James] Burk . . . knew that Mr. Yatsevitch relied upon his advice in connection with all legal issues that arose and, in particular, in connection with the loan from Hard Money Bankers and Mr. Yatsevitch's agreement to invest in CTI[;]
>
> [Plaintiff James] Burk provided advice to Mr. Yatsevitch in connection with his decision to invest in CTI[;]
> . . .
> [Plaintiff James] Burk breached his fiduciary duty to Mr. Yatsevitch in connection with the CTI investment in that he did not act in good faith or with complete candor when he made representations concerning Mr. Allemang and/or the

3

> profitability of CTI. To the contrary, [plaintiff James] Burk acted in bad faith, because his actions were undertaken to further his own self-interest in creating a possibility that CTI would be able to engage in a transaction that would result in substantial profits to [plaintiff James] Burk[;]
>
> . . .
>
> [Plaintiff James] Burk, who had previously represented Mr. Yatsevitch on other matters, engaged in conduct that communicated his consent to act as counsel for Mr. Yatsevitch with respect to the loan from Hard Money Bankers. As counsel to Mr. Yatsevitch, [plaintiff James] Burk had a duty to exercise reasonable care and skill with respect to the contracts to which Mr. Yatsevitch became a party, including all of the documents that relate to the loan between CTI and Hard Money Bankers . . ., and to safeguard the interests of both CTI and Mr. Yatsevitch[;]
>
> [Plaintiff James] Burk breached his duty of care by failing to inform Mr. Yatsevitch of various false representations in the Hard Money loan documents; by failing to negotiate with Hard Money Bankers in a manner to protect Mr. Yatsevitch's interests; and by failing to advise Mr. Yatsevitch about various significant aspects of the Hard Money [Bankers] loan documents[;]
>
> [Plaintiff James] Burk failed to adhere to the D.C. Rules of Professional Conduct in connection with the CTI loan in that he became engaged in business with a client in at least two respects, (a) by acting as counsel to CTI while owning a significant percent of that company and (b) by doing business with a client while failing to accurately, fully and fairly disclose all aspects of the business to Mr. Yatsevitch[;]
>
> [Plaintiffs James] Burk and Burk & Reedy[, LLP] were not only overseeing, but also promoting the transactions and business dealings that resulted in Mr. Yatsevitch agreeing to guaranty [sic] the loan to CTI from Hard Money Bankers . . . . [; and]
>
> [Plaintiff James] Burk's breach of the applicable standard of care has caused Mr. Yatsevitch to sustain damages in that he had to repay the CTI loan (including all related charges), incurred substantial attorney[']s fees and lost money as a result of having to sell [his] [r]esidence very quickly and accept a price far below its fair market value.

Def.'s Facts ¶ 18; see also Pls.' Resp. to Def.'s Facts ¶ 7 (internal quotation marks omitted).

When Mr. Yatsevitch commenced his lawsuit, the plaintiffs were insured under "a Lawyers Professional Liability Insurance Policy" (the "Policy") issued by the defendant. Def.'s Facts ¶ 19; see also Pls.' Resp. to Def.'s Facts ¶ 8; Pls.' Facts ¶ 9; Def.'s Resp. to Pls.' Facts ¶ 9;

4

Pls.' Summ. J. Mot., Ex. 8 (Professional Liability Insurance Policy ("Ins. Policy")).[2] The pertinent coverage provisions of the Policy include the following:

### I. INSURING AGREEMENT

#### A. COVERAGE

The **Company** will pay on behalf of an **Insured**, subject to the limit of liability, all amounts in excess of the deductible shown in the Declarations that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim**[3] that is made during the **Policy Period** and reported to the **Company** during the **Policy Period**, any subsequent renewal of the Policy or any extended reporting period based on an act or omission in the **Insured's** rendering or failing to render **Legal Services** for others.

. . .

#### B. DEFENSE AND INVESTIGATION

The **Company** shall have the right and duty to defend any **Claim** based on an act or omission in the **Insured's** rendering or failing to render **Legal Services** for others, seeking **Damages** that are covered by this policy and/or any **Claim** alleging **Personal Injury** made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

Def.'s Facts ¶ 20; see also Pls.' Resp. to Def.'s Facts ¶ 9. The Policy also states that

**LEGAL SERVICES** means those services performed by an **Insured** as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee or in any other fiduciary capacity but only where the act or omission was in the rendition of services ordinarily performed as a lawyer. **Legal Services** shall not be extended to include services rendered as a real estate agent or broker or as an insurance agent or broker;

and that

---

[2] The paragraphs within the Statement of Undisputed Facts in Support of [the] Plaintiffs' Motion for Summary Judgment are incorrectly numbered starting on page 3.

[3] The Policy defines a "[c]laim" as "a demand for money or legal services." Pls.' Summ. J. Mot., Ex. 8 (Ins. Policy), at 7. Additionally, the Policy provides that "two or more [c]laims arising out of a single act or omission, or [r]elated [a]cts or [o]missions shall be treated as a single [c]laim." Id. at 2.

>**DAMAGES** means the monetary portion of any judgment, award or settlement, provided such settlement is negotiated with the assistance and approval of the **Company**. **Damages** do not include:
>
>>1. compensation for bodily injury to, sickness, disease, death of any person, emotional distress or other emotional judgments or awards;
>>
>>2. compensation for injury to or destruction of tangible property or loss of use or value thereof;
>>
>>3. personal profit or advantage to which the **Insured** was not legally entitled;
>>
>>4. criminal or civil fines, penalties (statutory or otherwise), fees or sanctions;
>>
>>5. punitive, exemplary or multiple damages;
>>
>>6. matters deemed uninsurable;
>>
>>7. legal fees, costs and expenses paid to or incurred or charged by the **Insured**, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, setoff or otherwise, and injuries that are a consequence of any of the foregoing; or
>>
>>8. any form of equitable or non-monetary relief.

Def.'s Facts ¶¶ 21-22; see also Pls.' Resp. to Def.'s Facts ¶ 9. Moreover, the Policy excludes coverage where

>any [c]laim [against the insured is] based upon or arising out of, in whole or in part:
>
>>**A.** any intentional, criminal, fraudulent, malicious or dishonest act or omission by an **Insured**[4]; except that this exclusion shall not apply in the absence of a final adjudication or admission by an **Insured** that the act or omission was intentional, criminal, fraudulent, malicious or dishonest;
>>
>>. . .
>>
>>**D.** the **Insured's** capacity or status as:[5]
>>
>>>an officer, director, partner, trustee, shareholder, manager or employee of a business enterprise, charitable organization or pension, welfare, profit sharing, mutual or investment fund or trust;
>>>
>>>. . . [and]

---

[4] The parties have referred to this as the "Intentional Act Exclusion."

[5] The parties have referred to this as the "Insured Status Exclusion."

> **E.** the alleged acts or omissions by any **Insured**, with or without compensation, for any business enterprise,[6] whether for profit or not-for profit, in which any **Insured** has a **Controlling Interest** . . . .

Def.'s Facts ¶¶ 23-25; see also Pls.' Resp. to Def.'s Facts ¶ 9.  A controlling interest

> means the right of an **Insured** or a member of an **Insured's Immediate Family**, directly or indirectly, to:
>
>   1. own 10% or more of an interest in an entity; or
>   2. vote 10% or more of the issued and outstanding voting stock in an incorporated entity; or
>   3. elect 10% or more of the directors of an incorporated entity; or
>   4. receive 10% or more of the profits of an unincorporated entity; or
>   5. act as general partner of a limited partnership, managing general partner of a general partnership, or comparable position in any other business enterprise.

Def.'s Facts ¶ 26; see also Pls.' Resp. to Def.'s Facts ¶ 9.

In accordance with the Policy, the plaintiffs timely reported Mr. Yatsevitch's claims against them to the defendant, but the defendant denied coverage.  Pls.' Facts ¶ 9; see also Def.'s Resp. to Pls.' Facts ¶ 9.

## II. STANDARD OF REVIEW

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the depositions, affidavits, and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  And "a dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 247).  The moving party bears the initial burden of

---

[6] The parties have referred to this as the "Business Enterprise Exclusion."

showing the absence of a disputed material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If this burden is satisfied by the moving party, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. "[S]ummary judgment is appropriate 'if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)). The Court must bear in mind that "summary judgment is not the occasion for the court to weigh credibility or evidence[.]" Id. (citing Anderson, 477 U.S. at 255; Holcomb, 433 F.3d at 895). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [reasonable] jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this assessment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." Talavera, 638 F.3d at 308 (citing Anderson, 477 U.S. at 255). These inferences, however, must be "justifiable." Anderson, 477 U.S. at 255.

### III.  ANALYSIS

**A.  Whether the Defendant Has a Duty to Defend**

The plaintiffs argue that Mr. Yatsevitch's claims against them in the underlying action are covered by the Policy because at least one of the claims—the legal malpractice claim—stems

from plaintiff James Burk's rendering of legal services, or lack thereof,[7] to Mr. Yatsevitch in connection with the loan from Hard Money Bankers, thereby imposing a duty on the defendant to defend and indemnify them in the underlying action brought by Mr. Yatsevitch.  Pls.' Summ. J. Mem. at 4-5, 9, 15, 22.  The defendant denies that it has a duty to defend or indemnify the plaintiffs because Mr. Yatsevitch's legal malpractice claim arose, at least in part, from plaintiff James Burk's conduct in his capacity as a managing and controlling member of CTI, see Def.'s Opp'n to Pls.' Summ. J. Mot. at 1, thus relieving the defendant of any duty to defend or indemnify under the Insured Status Exclusion of the Policy, which bars coverage for any claims against an insured "based upon or <u>arising out of</u>, in whole or in part," from the insured's alleged status as a corporate representative of a business enterprise, and the Business Enterprise Exclusion of the Policy, which precludes coverage for any claims against an insured "based upon or <u>arising out of</u>, in whole or in part," from the insured's alleged conduct "for any business enterprise" in which the insured "has a controlling interest,"[8] Def.'s Facts ¶¶ 24-25 (emphasis added); see also Pls.' Resp. to Def.'s Facts ¶ 9.

In response to the defendant's positions, the plaintiffs dispute the applicability of either exclusion because Mr. Yatsevitch's legal malpractice claim does not "arise out of" plaintiff James Burk's status as a managing and controlling member of CTI.  Pls.' Summ. J. Mem. at 15-

---

[7] An insurer's duty to defend is broad, requiring the defense of all claims in an underlying action against the insured even if only one claim potentially falls within the terms of the Policy. Cont'l Cas. Co. v. Cole, 809 F.2d 891, 895 (D.C. Cir. 1987). Mr. Yatsevitch's legal malpractice claim is the only remaining claim that has legal underpinnings, see Pls.' Summ. J. Mem. at 15 ("[A]t least one claim in the [u]nderlying [Superior Court] [a]ction—[Mr.] Yatsevitch's malpractice claim—is <u>not</u> based upon [plaintiff James Burk's] alleged status as an officer[] or director[] of a business[,] but is rather based upon the allegation that . . . [he was] rendering legal services . . . to [Mr.] Yatsevitch."), such that it is covered by the Policy, see Def.'s Facts ¶¶ 20-21; see also Pls.' Resp. to Def.'s Facts ¶ 9.

[8] It appears that the defendant has conceded that the Intentional Act Exclusion of the Policy is not applicable to this case. See Pls.' Summ. J. Mem. at 13-14 (explaining that the exclusion is inapplicable); Def.'s Opp'n to Pls.' Summ. J. Mot. at 2-26 (failing to dispute inapplicability of the exclusion).

17, 22. Specifically, they contend that the term "arising out of . . . means proximately caused [by]," and that Mr. Yatsevitch has not sufficiently alleged in his legal malpractice claim that plaintiff James Burk's status as a managing and controlling member of CTI was the proximate cause of his alleged injuries. Id. at 16-17, 22. Alternatively, they contend that the term "arising out of" is ambiguous and so the Court should "construe[] the ambiguity . . . to their benefit and . . . favor[] coverage." Id. at 20, 22. Neither contention is convincing.

"An insurance policy is a contract between the insured and the insurer, and in construing it [a court] must first look to the language of the contract."[9] Cameron v. USAA Prop. & Cas. Ins. Co., 733 A.2d 965, 968 (D.C. 1999). Courts must interpret insurance contracts under a "reasonable person" standard; thus, the terms of the contracts have their common meaning unless a technical meaning is specified. Oler v. Liberty Mutual Ins. Co., 297 A.2d 333, 335 (D.C. 1972). Under District of Columbia law, when the language of insurance contracts is "clear and unambiguous, they will be enforced by the courts as written, so long as they do not 'violate a statute or public policy.'" Hartford Accident & Indem. Co. v. Pro-Football, Inc., 127 F.3d 1111, 1114 (D.C. Cir. 1997) (quoting Smalls v. State Farm Mut. Auto. Ins. Co., 678 A.2d 32, 35 (D.C. 1996)). "When unambiguous, all provisions of a contract, even exclusion provisions, 'must be enforced even if the insured did not foresee how the exclusion operated, otherwise courts will find themselves in the undesirable position of rewriting insurance policies and reallocating

---

[9] Neither party has explained which jurisdiction's law applies to determine whether the defendant has a duty to defend under the Policy, and the Policy is silent on the issue. The parties, however, have strongly suggested that District of Columbia law is appropriate. E.g., Pls.' Summ. J. Mem. at 6 (citing District of Columbia law); Def.'s Opp'n to Pls.' Summ. J. Mot. at 12-13 (relying on District of Columbia law); Pls.' Reply at 3, 5 (same). And so "the absence of a true conflict compels the application of District of Columbia law by default." Brown v. Dorsey & Whitney, LLP., 267 F. Supp. 2d 61, 70 (D.D.C. 2003) (Walton, J.) (alteration and internal quotation marks omitted); see also Navigators Ins. Co. v. Baylor & Jackson, PLLC, 888 F. Supp. 2d 55, 61 (D.D.C. 2012) ("As [the insured] is headquartered in the District [of Columbia] and several of the [u]nderlying [a]ctions for which it seeks coverage were brought here, [District of Columbia] law governs." (citation omitted)).

assignment of risks between insurer and insured.'" Silver v. Am. Safety Indem. Co., 31 F. Supp. 3d 140, 148 (D.D.C. 2014) (quoting Capitol Specialty Ins. Corp. v. Sanford Wittels & Heisler LLP, 793 F. Supp. 2d 399, 409 (D.D.C. 2011)); see also Chase v. State Farm Fire & Cas. Co., 780 A.2d 1123, 1127-28 (D.C. 2001).

"The insured bears the burden of showing that the underlying [action for which the insured seeks coverage] comes within the policy's coverage, and the insurer bears the burden of showing that an exclusion under the policy applies." See Nationwide Mut. Fire Ins. Co. v. Wilbon, 960 F. Supp. 2d 263, 267 (D.D.C. 2013) (citing Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co., 654 F. Supp. 1334, 1345-46 (D.D.C. 1986)); Cameron, 733 A.2d at 969. Any doubt as to "whether the [underlying action] falls within the terms of the policy must be resolved in the insured's favor," and any ambiguities regarding policy coverage must also be construed in favor of the insured. Cont'l Cas. Co. v. Cole, 809 F.2d 891, 895 (D.C. Cir. 1987). To assess whether there is a duty to defend in light of an exclusion, courts apply what is known as "the eight-corners rule." See Interstate Fire & Cas. Co. v. 1218 Wisconsin, Inc., 136 F.3d 830, 833 (D.C. Cir. 1998). The rule instructs courts to compare the scope of coverage in "the four corners of the relevant policy" with the scope of the allegations in "the four corners of the complaint [of the underlying action]." Am. Registry of Pathology v. Ohio Cas. Ins. Co., 461 F. Supp. 2d 61, 66 (D.D.C. 2006). The "obligation [to defend] is not affected by facts ascertained before [the] suit or developed in the process of litigation or by the ultimate outcome of the suit." Boyle v. Nat'l Cas. Co., 84 A.2d 614, 615 (D.C. 1951). Thus, an "insurer's duty to defend [an insured against a third party] hinges [up]on the allegations against the insured." Cole, 809 F.2d at 895.

To read a proximate cause requirement into the term "arising out of," which is found in the phrase "any claim based upon or arising out of, in whole in part" and which precedes all of

the exclusions in the Policy, the plaintiffs cite Cole, 809 F.2d at 896, as support for their proposition. That case does not advance the plaintiffs' position, however, as it sheds almost no light on how the Court should interpret the term "arising out of" in the Policy. What little it does reveal is that the District of Columbia Circuit is likely inclined to interpret the term "arising out of" to mean "relating to," or some similar definition. See id. at 897 (assessing provision where policy limited coverage of damages to only those "arising from the 'performance of professional services for others in the insured's capacity as a lawyer'" and noting that the "[the insurer]'s other line of reasoning [for disclaiming coverage] is that . . . [the underlying] allegations did not relate to [the plaintiff]'s performance of professional services, but rather that they arose from a breach of contract" (emphasis added)). More to the point is McCloskey & Co. v. Allstate Ins. Cos., 358 F.2d 544 (D.C. Cir. 1966). There, the District of Columbia Circuit interpreted a coverage clause in an insurance policy that used the language "arising out of," and explained that it "was intended to articulate a more liberal concept of causation than that of proximate cause in its traditional legal sense." Id. at 547.

To the extent that McCloskey is not on point because the case dealt with "the issue of coverage as opposed to the issue of . . . exclusion" in an insurance policy, Pls.' Reply at 8,[10] the Court is without any District of Columbia precedent precisely addressing the scope of the term "arising out of" as used in the context of the disputed exclusions in the Policy. And in the absence of applicable District of Columbia common law precedent, District of Columbia courts look to Maryland common law as the most authoritative source. E.g., Forrest v. Verizon Commc'ns, Inc., 805 A.2d 1007, 1013 n.12 (D.C. 2002) (noting that "Maryland Court of

---

[10] To be clear, the Court does not find the plaintiffs' distinction to be meaningful and is of the view that McCloskey is controlling on whether the term "arising out of" has a proximate cause requirement in the Policy. The Court has only continued with its analysis for the sake of completeness, if in fact the plaintiffs are correct that McCloskey provides no guidance on the issue.

Appeals' decision[s] [are] . . . especially persuasive authority when the District's common law is silent" on an issue (internal quotation marks omitted)); see also John Akridge Co. v. Travelers Cos., 876 F. Supp. 1, 2 (D.D.C. 1995) ("Although there is no applicable District of Columbia precedent on this issue, the Maryland courts have interpreted a nearly identical contract provision.").

Turning to Maryland law for guidance, the Court finds that the term "arising out of" is anything but ambiguous. For example, in N. Assurance Co. of Am. v. EDP Floors, Inc., 533 A.2d 682 (Md. 1987), a third party filed a tort action against the insured, a flooring company, alleging that the insured's employee negligently injured the third party when the employee unloaded a company truck while intoxicated. Id. at 683-84. The insured sought defense coverage in the tort action under its general business liability policy. Id. at 684. The insurer, however, invoked an exclusionary clause in the liability policy, which disclaimed coverage from any bodily injury "arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any automobile." Id. at 686. The Maryland Court of Appeals afforded the term "arising out of" its "common understanding, namely, to mean originating from, growing out of, flowing from, or the like." Id. at 688. And in rejecting the insured's contention that the injuries to the third party arose out of its negligent hiring, retention, and supervision of the employee, as opposed to its employee's negligent unloading of the truck, the Court of Appeals explained:

> While the[] words ["arising out of"] plainly import a causal relation of some kind, read in context, they do not require that the unloading of the truck be the sole "arising out of" cause of the injury; they require only that the injury arise out of the unloading of the vehicle. Therefore, if [the third party's] bodily injury arose out of . . . [the] employee's unloading of the truck, then that injury is excluded from coverage. This is so regardless of whether the injury may also be said to have arisen out of other causes further back in the sequence of events, such as the employee's consumption of alcohol, or the [insured]'s negligent failure to supervise the employee.

13

Id. at 688-89.  In light of the Court of Appeals' conclusion that "arising out of" is commonly understood to mean, "originating from, growing out of, flowing from, or the like," id. at 688, the Court will not "seek out ambiguity" in the Policy "where none exists," Athridge v. Aetna Cas. & Sur. Co., 351 F.3d 1166, 1172 (D.C. Cir. 2003) (citing Med. Serv. of D.C. v. Llewellyn, 208 A.2d 734, 736 (D.C. 1965)); see also Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1206 (D.C. 1999) ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." (alteration, ellipses, and internal quotation marks omitted)).

With the Maryland authority as its guide, the Court turns to the disputed provisions in the Policy.[11]  The Insured Status Exclusion applies if Mr. Yatsevitch's claims against the plaintiffs in the underlying action are "based upon or arising out of, in whole or in part," from plaintiff James Burk's "capacity or status as[] . . . an officer, director, partner, trustee, shareholder, manager or employee of a business enterprise, charitable organization or pension, welfare, profit sharing, mutual or investment fund or trust."  Def.'s Facts ¶ 24; see also Pls.' Resp. to Def.'s Facts ¶ 9.  Mr. Yatsevitch's legal malpractice claim clearly falls within the purview of this exclusion.  His allegations demonstrate that plaintiff James Burk simultaneously wore two hats while advising Mr. Yatsevitch to invest in CTI—that of an attorney and that of a managing member of CTI.  See Def.'s Facts ¶ 13 (alleging that plaintiff James Burk was a managing member of CTI, who legally advised Mr. Yatsevitch in obtaining a loan that would "result in substantial profits" to plaintiff James Burk and induced Mr. Yatsevitch into guaranteeing the loan by "promoting" certain CTI "transactions and business dealings," as well as agreeing to make him a managing member of CTI); see also Pls.' Resp. to Def.'s Facts ¶ 6; Yatsevitch Am. Compl. ¶¶ 18, 30-31,

---

[11]  The plaintiffs do not dispute that Mr. Yatsevitch has sufficiently alleged in the underlying action that plaintiff James Burk is an officer or director of CTI, or that he has a controlling interest in CTI.

46-47, 49-50, 57-59, 61, 137-38, 156-62.  In other words, the Yatsevitch allegations contend that plaintiff James Burk, as a managing member of CTI, labored under a conflict of interest while he was rendering legal advice to Mr. Yatsevitch regarding the loan transaction with Hard Money Bankers.  Thus, the legal malpractice claim arises, at least in part, out of plaintiff James Burk's "capacity or status" as a corporate representative of CTI.  No reasonable jury would conclude otherwise.

Likewise, Mr. Yatsevitch's legal malpractice claim fits neatly into the Business Enterprise Exclusion.  This exclusion applies if Mr. Yatsevitch's claims against the plaintiffs are "based upon or arising out of, in whole or in part," from plaintiff James Burk's conduct "for any business enterprise" in which he "has a [c]ontrolling [i]nterest."  Def.'s Facts ¶ 25; see also Pls.' Resp. to Def.'s Facts ¶ 9.  As noted above, the allegations show that plaintiff James Burk not only provided legal assistance to Mr. Yatsevitch during the loan application process, but that Burk also simultaneously engaged in conduct that advanced the business interests of CTI.  Def.'s Facts ¶ 13; see also Pls.' Resp. to Def.'s Facts ¶ 6; Def.'s Facts ¶¶ 5, 6, 23-25; Pls.' Resp. to Def.'s Facts ¶¶ 4, 9; Yatsevitch Am. Compl. ¶¶ 18, 30-31, 46-47, 49-50, 57-59, 61, 137-38, 156-62.  It therefore follows that the legal malpractice claim, at least in part, out of plaintiff James Burk's actions on behalf of CTI, a company in which he held a controlling interest.[12]  And again, the Court finds that no other conclusion can be reasonably reached by a jury.

---

[12] As a last-ditch effort to use their legal malpractice insurance and shield themselves from having to personally defend against allegations of a business deal gone awry on their own, the plaintiffs argue that the term "in part" is ambiguous in the phrase "based upon or arising out of, in whole or in part" because the term is not defined in the Policy.  Pls.' Reply at 6-7.  The Court finds this argument to be meritless, as the plaintiffs somehow find ambiguity in the term "in part," but not the term "in whole."  Clearly, "in part" must be interpreted to mean "not in whole," "less than a whole," or a similar definition.

**B. Whether the Defendant Has a Duty to Indemnify**

Whether the defendants have a duty to indemnify the plaintiffs if they are unsuccessful in defending the underlying action merits little discussion.  In the District of Columbia, an insurer does not have a duty to indemnify if there is no duty to defend.  I.J.G., Inc. v. Penn-America Ins. Co., 803 A.2d 430, 431 n.1 (D.C. 2002) (per curiam) ("[A] finding by a court that there is no duty to defend automatically means that there is no duty to indemnify." (internal quotation marks omitted)); see also Lexington Ins. Co. v. Dreyfuss Bros., Inc., No. 92-cv-1640, 1993 WL 102629, at *2 n.3 (D.D.C. March 23, 1993) (acknowledging that if the Court determines that there is no duty to defend, there would be no duty indemnify).  Here, because the Court has already concluded that the defendant has no duty to defendant, the defendant also has no duty to indemnify.

## IV.  CONCLUSION

In sum, the defendant has neither a duty to defend nor a duty to indemnify the plaintiffs in the underlying action.  Accordingly, the plaintiffs' motion for summary judgment is denied, and the defendant's motion for summary judgment is granted.[13]

**SO ORDERED** this 23rd day of March, 2015.

REGGIE B. WALTON
United States District Judge

---

[13] The Court has contemporaneously issued an Order consistent with this Memorandum Opinion.